Dave Rose v. Commissioner. David Rose v. Commissioner.
Rose v. Commissioner
Docket Nos. 111270, 2492.
United States Tax Court
1945 Tax Ct. Memo LEXIS 356; 4 T.C.M. (CCH) 18; T.C.M. (RIA) 45006; January 4, 1945
John T. Riley, Esq., and Darius F. Johnson, Esq., for the petitioner. B. M. Coon, Esq., for the respondent. HILL Memorandum Findings of Fact and Opinion HILL, Judge: The Commissioner determined deficiencies in income tax and a penalty as follows: Docket No.
Year
Deficiency
Penalty
111270
1939
$1,951.06
$1,333.37
2492
1940
1,693.14
1941
1,594.83
The first question, which turns on the construction of an antenuptial agreement is, what was petitioner's community share of his wife's earnings. The second question is as to the reasonableness of the salary paid by petitioner to his brother. The third question is whether petitioner incurred the 25 percent penalty provided by section 291 of the Internal Revenue Code for failure to file a proper return *357 for 1939. Findings of Fact The petitioner, David Rose, was a resident of Hollywood, California, during the taxable years 1939, 1940 and 1941. His returns for those years were filed with the collector of internal revenue for the sixth collection district of California. He was married to Margie Yvonne Reed, known as Martha Raye, on October 8, 1938. They separated and a property agreement was made on April 13, 1940, by which petitioner relinquished all claims to Martha Raye's earnings. Prior to the date of his entry into the Army and during the years in question his occupation was music composer and orchestra leader. Martha's mother, Peg Raye, had brought Martha up from childhood for a theatrical career and continued through the years in question to be her tutor and business manager. Prior to and in contemplation of the marriage of Martha to the petitioner, Martha and her mother entered into a written agreement by which Martha assigned 40 percent of her income to her mother, thus doubling the amount under an earlier agreement. This instrument, which was approved by petitioner, reads as follows: "THIS AGREEMENT, made this 26th day of September, 1938, by and between MARGIE YVONNE *358 REED, also known as MARTHA RAYE, Party of the First Part, and MAYBELLE HOOPER BALMA, also known as PEG RAYE, Party of the Second Part, WITNESSETH: "WHEREAS, the parties hereto are mother and daughter and have always enjoyed a close and confidential relationship with each other; and "WHEREAS, the Party of the First Part has achieved certain fame and success in the motion picture, theatrical and radio world and does ascribe her success therein to the efforts, the assistance, the instruction and the care of her mother; and "WHEREAS, on the 30th day of June, 1938, the parties hereto entered into an agreement wherein Margie Yvonne Reed, also known as Martha Raye, Party of the First Part, did assign, set over and give unto Maybelle Hooper Balma, also known as Peg Raye, Party of the Second Part herein, for a consideration set forth in said contract, a sum equal to twenty per cent (20%) of the gross earnings, emoluments and compensations earned and received by Party of the First Part, from the date of said agreement to the time of the death of Party of the Second Part; and "WHEREAS, the said Party of the First Part is desirous of showing, in a more substantial manner than is evidenced *359 by the agreement between the parties hereto dated June 30, 1938, her appreciation of the assistance and care which has been given to her by her mother, the Party of the Second Part; "NOW, THEREFORE, in consideration of the sum of One Dollar ($1.00), receipt of which is hereby acknowledged, paid by the Party of the Second Part to the Party of the First Part, love and affection entertained by the Party of the First Part for the Party of the Second Part, and other valuable considerations, it is hereby agreed: "That the Party of the First Part does, irrevocably and permanently, set over, assign and grant unto Party of the Second Part, for the balance of the natural life of the Party of the Second Part, a sum equal to forty per cent (40%) of the gross earnings, emoluments and compensations earned and received by the Party of the First Part from the date hereof to the time of the death of the Party of the Second Part from any activities in which the Party of the First Part may engage in connection with motion picture, theatrical or radio employment, or otherwise. "That the said amount of forty per cent (40%) will be payable to the Party of the Second Part on the first day of each and *360 every month by the Party of the First Part or the agents or others entrusted with the care and custody of the earnings of the Party of the First Part; and said custodians of any of the earnings of Party of the First Part are hereby instructed to deliver to the said Party of the Second Part forty per cent (40%) of any and all of the gross earnings, emoluments, and compensations earned and received by Party of the First Part, from the date hereof to the time of the death of Party of the Second Part, from any activities in which Party of the First Part may engage in connection with motion pictures, theatrical or radio employment, or otherwise. "That Party of the First Part hereby stipulates that said forty per cent (40%) herein assigned to Party of the Second Part is not assigned under any verbal conditions or with verbal instructions, but is to be the sole and separate property of Party of the Second Part, to do with as Party of the Second Part may, from time to time, elect and choose, and Party of the First Part does hereby irrevocably waive any and all rights to the said forty per cent (40%) assigned by her to Party of the Second Part. "Party of the First Part agrees that all *361 household expenditures, all personal expenditures, insurance premiums, payments on furniture, payments on automobiles, payments on real property, necessities of life, salaries of employees, medical care and any and all living expenses necessary to the livelihood of the Party of the First Part, shall be paid by the Party of the First Part from the sixty per cent (60%) of the balance of her earnings retained by her, and does hereby make reference to the same so that there can be no confusion as to the intent of Party of the First Part inasmuch as, prior to the signing of this agreement, Party of the Second Part, by authority of Party of the First Part, did assume the responsibility of paying all the personal accounts of Party of the First Part. "That this agreement and assignment shall be considered an irrevocable and permanent assignment to and for the benefit of the Party of the Second Part of the amount hereinabove specified. "That each of the parties hereto stipulates that they have had separate and independent legal counsel and advice and have consulted with friends and confidants with reference to the terms and conditions herein contained and understand the same, and each, *362 of her own free will and accord, agrees thereto. "IN WITNESS WHEREOF, the parties hereto have set their hands the day and year first above written. "(Signed) Martha Raye Party of the First Part "(Signed) D. Peg Hooper Balma Party of the Second Part "I, David Rose, have read the foregoing instrument to Margie Yvonne Reed, also known as Martha Raye, and understand the terms thereof and by my signature attest my approval thereof, and witness the signing of the same by the said Margie Yvonne Reed, also known as Martha Raye. "(Signed) David Rose David Rose." At the same time petitioner and Martha Raye entered into a written agreement by which petitioner waived his right to the 40 per cent to be paid Peg Raye as in the mother-daughter agreement. This latter instrument reads as follows: "THIS AGREEMENT, entered into this 26th day of September, 1938, by and between MARGIE YVONNE REED, also known as MARTHA RAYE, Party of the First Part, and DAVID ROSE, Party of the Second Part. WITNESSETH: "WHEREAS, the parties hereto are contemplating, at some future date, becoming husband and wife; and "WHEREAS, they desire by this pre-nuptial agreement to fix and determine the rights *363 that will accrue to each in the earnings, property and estate of the other by reason of the contemplated marriage, whether by virtue of the community property laws of the State of California, or otherwise, and to accept the provisions of this agreement in lieu and in full discharge and satisfaction of all such rights; and "WHEREAS, Party of the Second Part is familiar with the contract entered into by and between Margie Yvonne Reed, also known as Martha Raye, and her mother, Maybelle Hooper Balma, also known as Peg Raye, wherein said Margie Yvonne Reed, also known as Martha Raye, did assign, set over and transfer to her mother, Maybelle Hooper Balma, also known as Peg Raye, forty per cent (40%) of any and all of the said earnings of the said Margie Yvonne Reed, also known as Martha Raye, during the lifetime of her mother, for a consideration more fully set forth in said contract, dated September 26, 1938; and "WHEREAS, Party of the Second Part is familiar with said agreement, is fully in accord therewith and has witnessed the signature of the said Margie Yvonne Reed, also known as Martha Raye, thereto; "NOW, THEREFORE, in consideration of the foregoing and of the promises and *364 undertakings hereinafter set forth, the parties agree: "(1) The Party of the Second Part does hereby grant unto the Party of the First Part the right to enter into any employment for compensation she may desire. "(2) The Party of the Second Part does waive forty per cent (40%) of any interest or claim he might have by reason of the possible marriage between the parties hereto in or to any of the earnings of the Party of the First Part, irrespective of how the same may be applied, and does specifically waive his right to consider said earnings a part of the community property of the parties hereto. Said waiver is entered into by the parties so that the assignment previously made by the said Margie Yvonne Reed, also known as Martha Raye, to her mother, in the agreement dated September 26, 1938, assigning forty per cent (40%) of the gross earnings of said Margie Yvonne Reed, also known as Martha Raye, to her mother, can be fully complied with and executed, and no further claim be made by Party of the First Part or Party of the Second Part herein, in and to the said forty per cent (40%) heretofore assigned and more specifically set out in said agreement between Margie Yvonne Reed, *365 also known as Martha Raye, and Maybelle Hooper Balma, also known as Peg Raye, dated September 26, 1938. "IN WITNESS WHEREOF, the parties hereto have set their hands the day and year first above written. "(Signed) Martha Raye Party of the First Part "(Signed) David Rose Party of the Second Part" It was never Peg Raye's understanding that she was to get 40 per cent of the initial gross income of Martha Raye. She understood the agreement as paying her 40 per cent of the income after the necessary business expenses had been deducted. As Martha's business manager she took out her own 40 per cent share of Martha's income before delivering the remaining 60 per cent to Martha. She did this by first deducting all the necessary business expenses and then taking 40 per cent of what remained for herself. Detailed weekly reports showing this computation were furnished the accountant who made out Martha Raye's income tax returns on that basis of a 40 per cent of net income payment to Peg Raye. The term "gross earnings" as used in the agreement between Martha Raye and her mother was a layman's use of the expression and meant what is generally known as net income. Petitioner paid his brother *366 $50 a week in 1940 and 1941 for taking care of petitioner's library of sheet music used in his orchestra, filing it, and delivering it to the various places of petitioner's engagements, copyists and arrangers. He accompanied petitioner to his appearances every night and was present at rehearsals. The brother, who was 35, spent his full time at this work. Had petitioner not hired his brother for this work it would have been necessary for him to hire someone else at a salary of at least $50 a week. For each of the years 1940 and 1941 the salary of $2,600 paid by petitioner to his brother was reasonable compensation. For the year 1939 petitioner filed a tentative return, Form 1040, duly signed and acknowledged before a notary public. Later he timely filed as his final return Form 1040 signed by him but not acknowledged. The parties stipulated that petitioner was entitled to deductions from 1940 income of $327.50 for automobile expense which had theretofore been disallowed by respondent, and to $150 for wardrobe expense, which also had been disallowed by respondent. Also, that petitioner was entitled to a deduction from 1941 income, in addition to the amount already allowed, of $133.19 *367 for orchestra expense to arrangers and copyists, and an additional allowance of $521.12 as pay to orchestra members. It was also stipulated that Martha Raye's gross income for 1939 was $159,758.87, and that her gross income for the period from January 1, 1940, to and including April 13, 1940, the date of her separation from petitioner, was $63,465.03. Opinion The principal issue is the proper interpretation of the words "forty per cent (40%) of the gross earnings" as used in the antenuptial agreement between petitioner and Martha Raye whereby petitioner waived his right to consider that part of Martha Raye's earnings as a part of their community property. That "forty per cent (40%) of the gross earnings" was the amount Martha had agreed to pay her mother. The agreement between petitioner and Martha Raye was entered into immediately after and with reference to the agreement between Martha Raye and her mother. It incorporated this latter agreement by reference, which agreement was also signed and approved by petitioner. Both instruments are to be read together in determining the meaning of the words "gross earnings". The agreement between mother and daughter assigns "a sum equal *368 to forty per cent (40%) of the gross earnings" of Martha to her mother. There is a further clause in the contract which may help to interpret this. The California Civil Code provides in section 1641: Effect to be given to every part of contract. The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other. The agreement further provides as follows: Party of the First Part agrees that all household expenditures, all personal expenditures, insurance premiums, payments on furniture, payments on automobiles, payments on real property, necessities of life, salaries of employees, medical care and any and all living expenses necessary to the livelihood of the Party of the First Part, shall be paid by the Party of the First Part from the Sixty per cent (60%) of the balance of her earnings retained by her, and does hereby make reference to the same so that there can be no confusion as to the intent of Party of the First Part inasmuch as, prior to the signing of this agreement, Party of the Second Part, by authority of Party of the First Part, did assume the responsibility of paying all the personal *369 accounts of Party of the First Part. This list of items to be paid by Martha out of her 60 per cent are all personal expenses. The "salaries of employees" coming as it does in the context of "* * * necessities of life, salaries of employees, medical care and any and all living expenses necessary to the livelihood of the Party of the First Part" obviously means salaries of employees which are living expenses, i.e., maids, etc. If the words "gross earnings" used earlier in the instrument had been intended to carry their normal tax meaning of income before deduction of business expense, it would seem that a listing of the expenses Martha was to meet out of her 60 per cent should not be confined to personal expenses. The fact that it is specifically provided that Martha is to pay her personal expenses out of her 60 per cent and that they are listed in some detail is an indication that she is not to pay her business expenses out of her share. Expressio unius est exclusio alterius. Why then were the words "forty per cent (40%) of gross earnings" used in describing Peg Raye's share? The answer is to be found in the explanation as to why specific reference is made to the personal expenditures *370 of Martha: * * * does hereby make reference to the same so that there can be no confusion as to the intent of Party of the First Part inasmuch as, prior to the signing of this agreement, Party of the Second Part, by authority of Party of the First Part, did assume the responsibility of paying all the personal accounts of Party of the First Part. Since under a previous agreement the personal living expenses of Martha had come out of her income before Peg's share was computed, they now use the term "gross earnings" in the new agreement merely to indicate that Peg was to get her share before the deduction of Martha's personal expenses. We think the words "gross earnings" were used with this thought in mind and mean no more than net income as used in the revenue acts. Furthermore, in the light of this further paragraph in the agreement, the best that can be said for petitioner's contention that the words "gross earnings" were here used in their normal business and tax sense is that their meaning is ambiguous. This opens the door to parol evidence as to what the parties meant. Section 1649 of the Civil Code of California provides as follows: If the terms of a promise are in any *371 respect ambiguous or uncertain, it must be interpreted in the sense in which the promisor believed, at the time of making it, that the promisee understood it. Lassing v. James, 107 Cal. 348, 40 Pac. 534. Peg Raye, the only party to testify to this, stated that the agreement meant that she was to get 40 per cent of net earnings, not gross earnings, and that it was 40 per cent of net earnings that she actually took for herself periodically. Her weekly work sheets showed that it was 40 per cent of Martha's net income that Peg received.martha Raye's own income tax returns were made out on the basis that Peg received 40 per cent of her net income. From the very nature of Martha's income an agreement to pay 40 per cent of true gross earnings would have been absurd. She would form a theatrical unit and the theatre would pay her, say $10,000 per week which represented salaries, hotel and travel expenses for all her performers. If Martha's net income out of the transaction was $2,000, she would have a net loss after paying 40 per cent of gross to her mother. The Commissioner disallowed for each of the years 1940 and 1941 salary payments to petitioner's brother in excess of *372 $1,300. During those years petitioner paid his brother $50 a week for his full time services in taking care of petitioner's library of sheet music, filing it, making such additions to it as were necessary, delivering it to copyists and arrangers and, in general, taking full charge of the music. If petitioner had not hired his brother, it would have been necessary for him to hire someone else for this work and pay that person at least $50 a week. This salary of $2,600 a year for 1940 and 1941 was reasonable compensation for the services rendered. The Commissioner determined a 25 per cent penalty on petitioner for failure to file a valid, sworn to return for 1939. In his attempt to show reasonable cause for the failure to have his return acknowledged, petitioner brought forth testimony from the certified public accountant, whose firm made out the return, that he did not know whether petitioner signed the return in the presence of a notary but that if he did so, it might be that the notary was delinquent in not attesting it. Petitioner did not prove that he signed the return before a notary, nor has he borne the burden of showing that the return was not acknowledged for reasonable cause. *373 The accountant did not affirmatively testify that the return was sworn to. Failure to swear to the return requires the addition of the 25 per cent penalty. Plunkett v. Commissioner, 118 Fed. (2d) 644; Uhl Estate Co. v. Commissioner, 116 Fed. (2d) 403; Estate of Frederick L. Flinchbaugh, 1 T.C. 653; Robert A. Burns, 47 B.T.A. 34; Gus V. Winston, 22 B.T.A. 1194. Cf. Bouvelt Realty, Inc., 46 B.T.A. 45. Carnie-Goudie Mfg. Co., 18 B.T.A. 893. Decision will be entered under Rule 50.